# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL ACTION FILE** |
| | : | **NO. 1:11-CR-234-01-CAP/AJB** |
| **SOLOMON MANASSEH MUSTAFA,** | : | |
| | : | |
| **Defendant.** | : | |

## ORDER FOR SERVICE OF
## <u>REPORT AND RECOMMENDATION</u>

Attached is the Report and Recommendation ("R&R") of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. CrR. 58.1(A)(3)(a), (b). The Clerk is **DIRECTED** to serve upon counsel for the parties and directly upon any unrepresented parties a copy of the R&R and a copy of this Order.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections to the R&R within **fourteen (14)** days of service of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and be served upon the opposing party. *See United States v. Gaddy*, 894 F.2d 1307, 1315 (11th Cir. 1990). The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary

hearing for review by the District Court. Failure to object in accordance with this rule waives a party's right to review. FED. R. CRIM. P. 59(b)(2).

Pursuant to 18 U.S.C. § 3161(h)(1)(H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act ("the Act"), whether or not objections are actually filed.** If objections to this R&R are filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time all time between the filing of the R&R and the submission of the R&R, along with any objections, responses and replies thereto, to the District Judge. 18 U.S.C. § 3161(h)(1)(D), (H); *Henderson v. United States*, 476 U.S. 321, 331 (1986); *United States v. Mers*, 701 F.2d 1321, 1337 (11th Cir. 1983). The Clerk is **DIRECTED** to submit the R&R with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this  12th  day of  April  , 2012.

_____

**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL ACTION FILE** |
| | : | **NO. 1:11-CR-234-01-CAP/AJB** |
| **SOLOMON MANASSEH MUSTAFA,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Defendant Solomon Manasseh Mustafa is charged in a twelve-count indictment with violations of federal laws related to human trafficking, including, but not limited to, kidnaping; Mann Act violations; receipt of child pornography; and conspiracy to engage in human trafficking. [Doc. 1]. Before the Court are Mustafa's initial and perfected motions seeking to suppress identification testimony. [Docs. 26, 42].

The Court previously issued an Order setting out the permissible scope for an evidentiary hearing on the motions, which was conducted on January 10, 2012.[1] [Doc. 50]. Following the evidentiary hearing, [Doc. 54 (hereinafter "T__")], wherein

---

[1]  The Order also set out the reasons the Court declined to hold an evidentiary hearing as to some of the challenged identifications. The reasons are restated in this Report and Recommendation ("R&R").

the Court took evidence as to the identification of Mustafa by witness "DH,"[2] the parties filed post-evidentiary hearing briefs. [Docs. 56 (Mustafa), 59 (Government)[3]]. For the following reasons, the Court **RECOMMENDS** that the motions to suppress be **DENIED**.

## I.  Identifications not requiring an evidentiary hearing

### A.  Contentions of the Parties

In his motion and perfected motion, Mustafa contended that the government will seek to introduce at trial the out-of-court identifications of him made by four alleged victims.[4] He initially argues that the identifications should be suppressed from his trial because "[t]he social science uniformly demonstrates what courts and lawyers know - - that eyewitness identification is notoriously unreliable." [Doc. 42 at 4]. He cites a New Jersey Supreme Court opinion and special master report (hereinafter "the New

---

[2]     Although Mustafa has identified the witnesses by name, the Court refers to them by their initials.

[3]     Mustafa did not file a reply. [*See* Dkt.].

[4]     Three of the victims identified Mustafa from six-person photographic line-up spreads. [Doc. 42 at 2].  Apparently, one of the victims, DV, made her initial identification from a single photograph from a convenience store video, [*id*. at 2], and subsequently again identified Mustafa after being shown a six-person photographic line-up spread, [*id.* at 3].

AO 72A
(Rev.8/8
2)

Jersey Report") demonstrating that eyewitness identifications by persons in controlled situations were incorrect between a third and half of the time, and that seventy-five percent of persons ultimately exonerated by DNA evidence were misidentified by eyewitnesses. [*Id.* at 5 & n.1]. Mustafa further cites to the New Jersey Report as establishing that the manner in which a line-up is presented to the eyewitness has a huge impact on the line-up's reliability, and he cites to the report's conclusion that a proper eyewitness identification must be based on a double-blind procedure in which the administrator of the line-up, as well as the victim, are unaware of the presence of the suspect in the line-up. [*Id.* at 5-6]. He submits that the line-ups used in this case were not conducted using a double-blind test. [*Id.* at 7].

Mustafa next contends, again relying on the New Jersey Report, that a photographic line-up must use "fillers" (i.e., images of others who are not the subject of the investigation) who are selected based on the witness' own description of the suspect prior to the line-up and who are sufficiently similar to the suspect so that the suspect does not otherwise stand out. [*Id.* at 7]. As to the identifications in this case, Mustafa points out that local law enforcement and the FBI used the same line-up for two different witnesses, and alleges that the agencies did not tailor the selection of fillers to the description given by the witness making the identification. [*Id.* at 8].

3

Since the New Jersey Report recognized that a witness will likely disregard a filler who was not consistent with his or her own description, Mustafa argues that the array necessarily did not contain a large enough sample and thus was unduly suggestive. [*Id.*].

Next, Mustafa contends that the identification by victim RA was problematic because although she picked Mustafa out of a line-up conducted by local law enforcement as the person who kidnaped and raped her, [*see* Doc. 42-2], RA later admitted that she voluntarily joined Mustafa, and charges were brought against her for making false statements and filing a false report of a crime. [Doc. 42 at 8].

He challenges another identification by DV on the grounds that the identification spread included three black males in white t-shirts but only one of the males is facing the camera. [*Id.*; *see also* Doc. 42-3]. Mustafa then contends that the second identification by this witness was tainted because the line-up was blatantly suggestive, since his photograph was the only one with a different colored background and the sizing of his photograph was significantly smaller than the others in the array. [Doc. 42-9; Doc. 42-5].

The government opposes the motion, arguing that none of the line-ups was unduly suggestive. It first points out that all of the line-ups displayed

4

African-American men with substantial similarities in facial features, color, race, facial hair, general body type, and appearance. [Doc. 46 at 5]. It submits that each of the spreads, [Docs. 46-1, 46-2, 46-4, 46-5], contain blue backgrounds and depict men with very short black hair and a moustache. [Doc. 46 at 5]. All of those depicted were of the same body type, color and appearance, and the photographs depicted the subjects from the neck up or chest up, which it argues is not suggestive. [*Id.*]. The government argues that because the photos in each of the spreads were so similar, the fact that Mustafa's photograph may be distinguished from the others is an insignificant difference which did not rise to the level of "unduly suggestive." [*Id.*].

The government next points out that while both victims DW and DV were shown a photo spread containing the same photographs, [Docs 46-1, 46-4], they were in a different order, and at different times (almost two months apart). Also, DV's photo identification was conducted by FBI agents who were unaware of Mustafa or whether he was in the line-up. [Doc. 46 at 7].

Next, the government submits that the identification of Mustafa by DV from Doc. 46-3 was not unduly suggestive simply because in the video-shot photograph, Mustafa was the only person facing the camera. [Doc. 46 at 8]. The government also argues that RA's identification of Mustafa, [Doc. 46-2], was not rendered unduly

5

suggestive simply because RA later stated that her involvement with Mustafa was not coerced. [Doc. 46 at 9]. As to the final identification, the government argues that DH's identification of Mustafa from Doc. 46-5 was not unduly suggestive, contending that the photo spread reflected suspects that fit DH's description of her attacker. [Doc. 46 at 10-11]. Since the identification procedures were not unduly suggestive, the government argues that no evidentiary hearing is warranted. [*Id.* at 11].

The government then argues that, in any event, even if one or more of the identification procedures was unduly suggestive, the Court must still determine if under the totality of the circumstances, the identification was nonetheless reliable, because each of the victims was kidnaped, raped and beaten by the attacker over a number of days in different locations. [*Id.* at 12-19].

B.     *Discussion*

The Supreme Court established the due process standard against which police identification procedures are to be measured in *Stovall v. Denno*, 388 U.S. 293 (1967). Due process prohibits witnesses from testifying about out-of-court identifications when there is a very substantial likelihood of misidentification. *Neil v. Biggers*, 409 U.S. 188, 198 (1972). A violation of due process occurs when, under "the totality of the circumstances," a confrontation procedure is "unnecessarily suggestive and

6

conducive to irreparable mistaken identification." *Simmons v. United States*, 390 U.S. 377, 384 (1968); *see also Perry v. New Hampshire*, 132 S. Ct. 716, 724 (2012) (reiterating that "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary") (citations omitted). Claims that the circumstances of a police identification procedure are so unnecessarily suggestive as to produce irreparable misidentification must be evaluated in light of the totality of the surrounding circumstances. *Nettles v. Wainwright*, 677 F.2d 410, 414 (11th Cir. 1982); *Rudd v. State of Fla.*, 477 F.2d 805, 811 (5th Cir. 1973)[5] ("Pretrial identification procedures should not be found impermissibly suggestive on the basis of rigid application of categorical rules. For example, indicia of reliability such as a witness' strong recollection from an independent, untainted source may in some cases counteract the suggestiveness in certain identification procedures. Also, exigencies of efficient police work may occasionally justify identification procedures that in other contexts would be unnecessarily suggestive. Because of these and other variables spanning the range of human experience, courts

---

[5]    In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

AO 72A
(Rev.8/8
2)

have wisely counseled against determination of constitutionally impermissible suggestiveness on other than a case-by-case basis.").

Courts employ a two-part test for determining whether an out-of-court identification can properly be admitted. First, the Court determines whether the original identification procedure utilized by law enforcement was unduly suggestive. A finding of impermissible suggestiveness raises concern over the reliability of identification and triggers closer scrutiny by the Court to determine whether such a procedure created a substantial risk of misidentification. *United States v. Harper*, 680 F.2d 731, 734 (11th Cir. 1982); *Allen v. Estelle*, 568 F.2d 1108, 1113 (5th Cir. 1978). In *Foster v. California*, 394 U.S. 440 (1969), the Court held that a line-up is unduly suggestive when it is virtually inevitable that the witness will select the individual whom the police have singled out. This rule, unlike the exclusionary rule of the Fourth Amendment, is aimed not at deterring unfair police practices but at the reliability *vel non* of the truth-finding process. *See id.* The Court must first decide whether the original identification procedure was unduly suggestive. If not, that ends the inquiry. *Williams v. Weldon*, 826 F.2d 1018, 1021 (11th Cir. 1987).

Second, if the procedure was impermissibly suggestive, courts next examine whether the identification procedure created a substantial likelihood of

AO 72A
(Rev.8/8
2)

misidentification. *United States v. Smith*, 459 F.3d 1276, 1294 (11th Cir. 2006) (citing *United States v. Russo*, 796 F.2d 1443, 1452 (11th Cir. 1986)); *see also Cikora v. Dugger*, 840 F.2d 893, 895 (11th Cir. 1988). This is because the fact "that the identification procedure used was suggestive, alone, does not violate due process." *Irwin v. McDonough*, 243 Fed. Appx. 486, 492 (11th Cir. June 19, 2007) (citing *Neil*, 409 U.S. at 198-99). Instead, "a claimed violation of due process of law in the conduct of a confrontation[, *i.e.*, an out-of-court identification,] depends on the totality of the circumstances surrounding it." *Stovall*, 388 U.S. at 302, *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314 (1987). Thus, the "central question" is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil*, 409 U.S. at 199; *see also Manson v. Brathwaite*, 432 U.S. 98, 113-14 (1977) (emphasizing that the totality of the circumstances were examined to determine whether identification testimony was admissible because the identification possessed sufficient indicia of reliability). "[R]eliability is the linchpin in determining the admissibility of identification testimony . . . ." *Manson*, 432 U.S. at 114.

If the procedures utilized were unduly suggestive, the Court then considers whether, under the totality of the circumstances, "the identification was nonetheless

9

reliable." *United States v. Brown*, 441 F.3d 1330, 1350 (11th Cir. 2006) (citing *United States v. Diaz*, 248 F.3d 1065, 1102 (11th Cir. 2001). The factors that go into this "totality of the circumstances" test include: the opportunity to view, the degree of attention, the accuracy of the description, the level of certainty, and the length of time elapsing between the crime and the identification. *Blanco v. Singletary*, 943 F.2d 1477, 1508 (11th Cir. 1991) (footnote omitted); *see also Perry*, 132 S. Ct. at 725 n.5.

The defendant bears the burden of proving that the identification procedure used was "so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Simmons*, 390 U.S. at 384 (cited in *Neil*, 409 U.S. at 198); *United States v. Wade*, 388 U.S. 218, 240 n.31 (1967); *Albert v. Montgomery*, 732 F.2d 865, 871-72 (11th Cir. 1984). Only after the defendant meets this burden does the burden shift to the government to prove that the identification was reliable independent of the suggestive procedure. *Wade*, 388 U.S. at 240; *see also United States v. Sanchez*, 24 F.3d 1259, 1261-62 (10th Cir. 1994).

In its previous Order, [Doc. 50], the undersigned concluded that the only identification that warranted an evidentiary hearing was the identification made by DH. The Constitution does not impose a *per se* rule requiring an evidentiary hearing in every case of a claimed improper identification. *Watkins v. Sowders*, 449 U.S. 341, 349

10

(1981); *Brown*, 441 F.3d at 1350 (quoting *United States v. Smith*, 546 F.2d 1275, 1279-80 (5ᵗʰ Cir. 1977) (holding that "[a]n evidentiary hearing is not required where none of the critical facts are in dispute and the facts as alleged by the defendant if true would not justify the relief requested") (quotation marks omitted)).

First, the Court will explain why the New Jersey Supreme Court's Report is unavailing as to suppression of the identifications made by RA, DV and DW.[6] As the U.S. Supreme Court has just reiterated, underlying all of its identification cases is "not [the] suspicion of eyewitness testimony generally, but only to improper police arrangement of the circumstances surrounding an identification." *Perry*, 132 S. Ct. at 726. At the same time, "the potential unreliability of a type of evidence does not alone render its introduction at the defendant's trial fundamentally unfair." *Id.* at 728 (citations omitted). Thus, the Court concluded that "[t]he fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." *Id.* Because the New Jersey Supreme Court's Report's conclusion–that courts must hold pretrial hearings to evaluate eyewitness identifications as though they were trace evidence and must judicially adopt

---

[6]     DH's identification will be discussed in Section II, below.

11

and implement the identifications as scientific findings, [Doc. 42-6 at 86]–directly contradicts the Supreme Court's most recent pronouncements in *Perry*, the Court rejects the recommendations of that Report.

Second, aside from DH's identification, which is discussed below, the identifications are not unduly suggestive. As to the identifications by DW and DV, Mustafa has not demonstrated how the identification procedure was rendered unduly suggestive by the fact that two witnesses were shown photo spreads which contained the same photographs in a different order. While Mustafa appears to argue that the second iteration of the photo spread containing the same photographs necessarily means that it did not comport with the second witness' description of her attacker, he has failed to demonstrate, much less allege, that fact, and in any event, the government's representation of DV's description (black male, in his thirties, about six feet tall, 180 pounds, with brown eyes and black hair, [Doc. 46 at 6],) belies the validity of this argument.

As to DV's selection of Mustafa from a still image from the convenience store security video, the fact that Mustafa is apparently the only person facing the camera does not demonstrate that the procedure was unduly suggestive. Mustafa has not demonstrated that the video photo made it "made it all but inevitable" that the witness

12

would select the individual whom the police have singled out. *Foster*, 394 U.S. at 443; *Carver v. State of Alabama*, 537 F.2d 1333, 1335 (5th Cir. 1976).

Next, RA's apparent recantation of the nature of her relationship with Mustafa does not demonstrate that the identification was unduly suggestive. Whether RA was Mustafa's victim or willing participant does not affect whether she was properly able to identify him.

Since Mustafa did not demonstrate that the identification techniques used by law enforcement in connection with the identifications by DW, DV, or RA were "unduly suggestive," no evidentiary hearing as to these identifications was warranted. *See United States v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000) (no abuse of discretion in denying motion for an evidentiary hearing where underlying motion to suppress was "wholly lacking in sufficient factual allegations").

Also, by making a finding that the photo displays and procedures used were not impermissibly suggestive, the undersigned need not examine the second part of the due process analysis. *See Cikora*, 840 F.2d at 895-96 ("If [a court] conclude[s] that the photo array was not impermissibly suggestive, [the court] need not proceed to" the second step.); *Weldon*, 826 F.2d at 1021 (noting that if a photo array is not unduly suggestive, the due process inquiry ends).

13

Thus, the undersigned **RECOMMENDS** that Mustafa's motion and supplemental motion to suppress identifications by DV, DW, and RA be **DENIED** without an evidentiary hearing.

## II.     Evidentiary hearing as to DH's identification

As to DH's identification, the Court was generally persuaded by the government's arguments that the totality of the circumstances demonstrated that the identification was reliable. However, at least based on the photo spread filed with the government's brief, [Doc. 46-5 at 2], the Court concluded that an evidentiary hearing was needed to complete the record for the District Court. Mustafa's photo in that exhibit arguably is different from the others in that his head is smaller, there is a partial border around his photograph, the shade of the background is perceptively lighter than that of all of the other suspects, and the person in position number 6 was dressed differently (with a coat and tie while the others are in mainly white t-shirts). While this last fact points towards non-suggestiveness as to Mustafa, it also potentially reduced the sample size. Thus, these differences highlighted by the Court warranted an evidentiary hearing on this identification alone.

14

## A.    Facts presented at the evidentiary hearing

On May 29, 2010, Homewood, Alabama, Police Department Detective Joseph Rankin was the on-call detective dispatched to the Motel 6 in Homewood in response to a report of a sexual assault against DH.  T4-5; Gov't Ex. 4.  When he first saw DH, he described her as "stunned, cooperative but despondent, very quiet and obviously scared and shaken."  T5.  DH had abrasions on her face, marks on her arms and tape marks around her ankles and wrists.  T7; Gov't Exs. 7-12.  She stated she had been duct-taped, and the abrasions and bruises that Rankin observed on her were consistent with being duct-taped.  T8.  She was wearing a white tank top and boxer shorts, which were the only clothes left by "G" and "Lady," two other persons who had been with her.[7]  T6.  DH told Rankin what motel room she had been in; Rankin went there and seized the bed sheets, trash-can liners, and a telephone cord.  T6.

DH told Rankin that she traveled with a man called "G" and a woman called "Lady" for two days on their way from Atlanta, and that she spent approximately three hours with them in the car.  T9.  DH described G as a black male, approximately thirty-two years of age, 6'1" tall, 200 pounds, muscular build, with a tattoo of flames on his forearm.  T7.

---

[7]    When DH was located, however, she was nude.  T6.

15

AO 72A
(Rev.8/8
2)

Rankin re-interviewed DH on June 11, thirteen days later. T10. The interview was recorded. T10. Rankin conducted the interview with Sergeant Juan Rodriguez, who was investigating a similar case involving DV. T11, 38.

DH was interviewed for about one and one-half hours before she was asked to identify Mustafa. Gov't Ex. 5 (hereinafter "DVD"). During the first part of the interview, DH was told that the officers needed to interview her and then they would show her some photo lineups to see if she recognized anybody in those lineups. DVD at 10:18:01-18. She was told that Rodriguez had a case similar to hers. *Id.* 10:18:48. A little later in the interview, DH was advised that "through some investigative work we've identified these folks." *Id.* 10:26:21.

DH said she saw an advertisement on Craigslist for "women seeking women" and responded to the phone number listed there. *Id.* 10:20:15, 10:20:39. She texted and talked to a female (identified as "Lady"), and did not know that a male would become involved. *Id.* 10:19:43-52, 10:21:04. DH knew that the advertisement was for prostitution services. *Id.* 10:20:40. After this electronic contact for about a week and a half, Lady stated she was going to come pick up DH. *Id.* 10:19:58.

Lady showed up in a tan 4-door vehicle at about 3:00 p.m. on May 27. *Id.* 10:46:45. There was a male in the vehicle, so DH got in the back seat. *Id.* 10:22:43.

16

She recalled that the vehicle she was picked up in was either a Toyota or Lexus, that it was tan in color with almost purple-tinted widows, and that the radio and one of the rear doors did not work. *Id.* at 10:22:55. DH was somewhat concerned by the presence of the male, so she wrote down the directions they were traveling on her telephone. *Id.* 10:24:15. Lady referred to the male as "G." *Id.* 10:24:43. After about forty minutes, *id.* 10:26:50, they arrived at a house after taking a circuitous route, including stopping for soft drinks. They entered the garage and closed the garage door before they got out of the vehicle. *Id.* 10:25:13. DH described the house as yellowish tan (with chipping paint), with a one-car garage up a small slope and five bedrooms, *id.* 10:25:28, 10:27:26, 10:27:51, and stated that it was in the vicinity of BC Haney Elementary School. *Id.* 10:26:25. DH went into the hall bathroom as instructed and got into her swim suit, *id.* 10:28:55, and then G started taking model-type photographs of her. *Id.* 10:26:20-10:29:30. During these fifteen minutes of photos, G instructed her how to pose. *Id.* 10:30:45-10:31:30. Lady took DH's purse. *Id.* 10:32:00.

Thereafter, they left the house and went to an EconoLodge motel,[8] and then to the Hilltop Motel on Moreland Avenue in Atlanta. *Id.* 10:33:00. They arrived at that location about 5:00 to 5:30 p.m. *Id.* 10:47:13-31. DH was allowed to shower, and as

---

[8]     They were unable to secure a room at the EconoLodge. T25.

17

she exited the shower, G hit her across the face with the back of his hand, *id.* 10:34:00, and told her she could not go home until she earned him "a stack" ($1000). *Id.* 10:34:13. He told her to take off her clothes, and then he hit her again in the face. *Id.* 10:34:35. DH said that G smoked Camel cigarettes and Lady smoked Newports. *Id.* 10:34:59-10:35:02.

When G and Lady went to the other side of the room away from her, DH tried to escape, and G grabbed her hair from behind, slammed her to the ground, and then both G and Lady hit her. *Id.* 10:35:15-53. G made her get into the bed and get face down on all fours. *Id.* 10:36:00. Lady gave him a condom, and he told DH not to turn around to look at him. *Id.* 10:36:07-14. G raped DH vaginally from behind, while pulling her hair and hitting her, while Lady was telling her to shut up and stop crying. *Id.* 10:36:20-41. When DH tried to look back, G pulled her hair and hit her. *Id.* 10:37:20-10:38:40. They then made her lay on her stomach and cover up on the bed while they talked about prostituting her. *Id.* 10:40:15. She again was told not to look at them, and when she did, she was hit. *Id.* 10:41:33.

After about ten minutes, G told her to sit up and drink Svedka Vodka, even though she did not want to. *Id.* 10:41:55-10:42:28. They also forced her to snort cocaine. *Id.* 10:42:48-10:43:12.

AO 72A
(Rev.8/8
2)

While Lady left for about an hour (presumably to engage in prostitution), *id.* 10:45:36, DH was left in the room with G. He took a photo of her on his cellphone. *Id.* 10:45:51. When Lady returned at about 2:00 to 3:00 a.m., they started packing up the motel room. *Id.* 10:46:30, 10:49:20. G and Lady put duct tape over DH's eyes, put a sheet over her head, and walked her out to the car, which was parked right outside the motel room. *Id.* 10:49:30-55.

They drove for fifteen to twenty minutes and arrived at the house where they were earlier. *Id.* 10:51:30. Despite her eyes being duct-taped, DH could partially see under the tape. *Id.* 10:51:48-10:52:15, 11:00:00. Her eyes were un-taped when she was allowed to shower. *Id.* 11:03:00.

They re-taped her eyes and then drove to Alabama. DH estimated that they arrived at the hotel at between 11:00 p.m. and midnight. *Id.* 11:06:35. They took the tape off of her eyes. *Id.* 11:06:40. G kept going in and out of the room. DH was told to change into clothing for "customers." *Id.* 11:08:05. However, no customers appeared.

Around 3:00 to 3:30 a.m., G made DH take off her clothes and taped her again. *Id.* 11:09:00. G and Lady then went to bed, with DH laying between them. After G and Lady woke up, DH was allowed to take another shower, and they took off the tape.

19

*Id.* 11:10:30. When DH got out of the shower, G and Lady were gone, and DH was able to escape by making contact with the motel staff. *Id.* 11:30:15.

The officers asked DH to provide physical descriptions of Lady and G. *Id.* 11:12:50. After describing Lady, she described G as 6'1", about 240 pounds, *id.* 11:19:04, with a dark complexion, *id.* 11:19:21. She stated that he had lesions, pits, or holes all over his face. *Id.* 11:19:26-42. DH stated she did not observe G's hair because he always wore a hat. *Id.* 11:19:52. G wore a black leather hat when they were in Atlanta and a black-and-red "A" (for Atlanta) hat when they were in Alabama. *Id.* 11:20:07, 11:20:20. She described him as having missing or chipped teeth, *id.* 11:20:30; a fairly big nose, *id.* 11:20:49; and a "fire" tattoo on his arm from his wrist to his elbow. *Id.* 11:21:10-36. She described his accent as being from Georgia. *Id.* 11:22:03. She also stated that his build was average in that he was not muscular but also not fat. *Id.* 11:23:12. DH stated that on the last day before he left, G was wearing a black t-shirt, *id.* 11:24:15, and black leather pants with black-and-red Jordan shoes. *Id.* 11:24:30.

Sergeant Rodriguez stated that it "sounds like we know who this is, we have these people identified." *Id.* 11:25:48-55. He also stated that his case was somewhat similar, separated by one week's time. *Id.* 11:26:10.

20

AO 72A
(Rev.8/8
2)

The officers then asked DH about responding to Lady's Craigslist advertisement, and told her about differences and similarities between her case and that of the other complaining witness. *Id.* 11:27:50, 11:30:45, 11:31:05. They also questioned her about whether she acted as a prostitute on other occasions, which she denied. *Id.* 11:28:35, 11:28:57.

DH was then told that they were "getting ready to show you some line ups here." *Id.* 11:36:24. She also was told that "these lineups may or may not contain the individuals we suspect for this." *Id.* 11:36:31. She was told that they needed her to "look at these" and to "take her time," *id.* 11:36:40, but was warned that they could not accept an identification in the manner of "it's between this one and this one," *id.* 11:35:50. She was told again to take her time and "identify the person you think is the suspect." *Id.* 11:37:01. However, before showing her any lineups, DH was questioned about the vehicle again, *id.* 11:37:10-11:38:20, the time it took to travel between her home and the house she was taken to, and the directions traveled to the hotel, *id.* 11:39:11-11:40:33, because the officers were trying to find the house because it was described by both victims. *Id.* 11:40:55.

DH was then told that "[W]e feel pretty sure we've i.d.'ed these guys," *id.* 11:40:56, but she was warned that the photos in the photo spread were from

21

different systems, from different cities, different states," and that she should not be swayed by that. *Id.* 11:41:10. She was advised to "look at the photo and the person, see if the person fits the description you are talking about." *Id.* 11:41:15. She also was told that "the lighting is different, the camera is different, different states do things different ways," *id.* 11:41:23, so she should "focus on the photo." *Id.* 11:47:27. DH also was told that "if you know them, they'll jump off the page." *Id.* 11:41:29. Rankin added that men shave and they grow facial hair, but DH interjected, "I know what they look like." *Id.* 11:41:48.

During the course of Rodriguez's investigation of DV's complaints, she told him of a Tucker, Georgia, hotel in which they stayed. From the manager of that hotel, Rodriguez obtained a copy of a driver's license and name of a black male, the defendant Solomon Mustafa. T38-39. Rodriguez obtained Mustafa's Georgia driver's license from the Georgia Department of Motor Vehicles. T39. From that photograph and the victims' descriptions of the perpetrator, he prepared Gov't Ex. 1, using an Alabama Police computer program called "ALACOP," which selects photographs from Alabama driver's licenses, and through which he was able to access photographs based on the height, weight, approximate age, and structure of the known subject. T39-40. Since he received so many photographs from the ALACOP system, he had to

22

individually match Mustafa's photograph with those of similar skin complexion, hair, facial hair, and facial structure. T42, 47. He used Mustafa's most recent driver's license photo because it was the most recent photograph and also because other driver's license photos of Mustafa he received from Georgia were very dark or had backgrounds that were very different from Alabama driver's license photo backgrounds. T42.

Rodriguez also developed a photo spread for female subjects using the driver's license photo of one "Shanterica White," the identification obtained in renting the motel room in Homewood for DV's case. T43-44; Gov't Ex. 3.

DH was first shown a photo spread containing males, DVD at 11:42:01, and immediately stated, "That one," and pointed to position number 5, which was Mustafa's driver's license photo. She was asked if she was "absolutely positive" and she replied, "yes, sir." She was asked "How do you know?" and responded that it "looks just like him." *Id.* 11:42:02-11:42:11. She was then asked whether there "was anything about that picture that stands out that made you identify him so quick?" *Id.* 11:42:27. She looked again at the display and stated, "the look on his face." *Id.* 11:42:38.

23

After she picked Mustafa's photograph from the photo spread, DH answered more questions about what happened to her while she was with G and Lady.  T15.  DH was unable to identify anyone from the photo spread of women suspects.[9]  T45.

### B.    Contentions of the parties

Mustafa contends that DH's identification was unconstitutional because Rodriguez created an improperly suggestive lineup:  Mustafa's photograph has a much lighter background than the other five photographs and it alone had a black-line border around it.  [Doc. 56 at 6].

He also contends that DH's identification was constitutionally flawed because Rankin introduced her to Rodriguez, explained that he had a case similar to hers, and Rodriguez stated that, "[w]e know who these people are."  [*Id.* at 6-7].  He argues that this statement conveyed to DH that they had the suspect, the suspect was in the line-up, and they expected her to pick him out of the line-up.  [*Id.* at 7].

Mustafa then argues that the identification was not reliable because DH was blindfolded for "most of her ordeal and marked by the fear of being struck physically."  [*Id.* at 7-8].  He further contends that DH's degree of attention would have

---

[9]    In fact, Defendant Kalandra Wallace was not displayed in that photo spread.  T45.

24

been "pretty low" since when she got in the car, she began texting, was in constant fear of getting struck, and was either blindfolded or concentrating on escaping. [*Id.* at 8]. He also submits that her description of her assailant, other than the tattoo, was very generic (black male, thirty-two years old, 6'1", 200 pounds), and argues that the fact that she did not mention that G wore a hat at first or see his hair demonstrates that she was stressed and therefore her identification was not reliable. [*Id.*]. He argues that her certainty in making the identification was prompted by the officer's remarks, and thus the totality of the circumstances demonstrated that the identification was both unduly suggestive and unreliable. [*Id.* at 8-9].

Mustafa also argues that the officers' conduct during the interview and identification violated the proper practices in conducting identifications. First, before showing the array, they told DH that they knew who the suspects were and that Rodriguez was conducting a similar investigation, which suggested that an identification was necessary and that they had a suspect. Since the New Jersey Report instructs officers to advise an eyewitness that the suspect may or may not be in the lineup and that she should not feel compelled to make an identification, the officers' remarks tainted the procedure even if they admonished her that the suspect may not be in the lineup. [*Id.* at 9 (citing New Jersey Report at 21)].

AO 72A
(Rev.8/8
2)

He also contends that the identification procedure utilized in the present case did not involve a double-blind administration (i.e., where both the eyewitness and the officer performing the identification procedure do not know whether the suspect is included in the lineup). [*Id.* at 9-10]. Mustafa contends, therefore, that Rodriguez's belief that Mustafa was the right suspect and his preparation of the photo array not only "suggest[ed] which photo is the 'right' answer, but it [also conveyed] a general pressure to identify someone." [*Id.* at 10].

In rebuttal, the government contends that DH's identification did not result from unduly suggestive identification procedures. First, it contends that the array itself was not unnecessarily suggestive because Rodriguez obtained Mustafa's most recent driver's license photograph; used the physical descriptions from DH and DV (dark-complexioned black male, 6'1" tall, average to muscular build, 200 pounds, brown eyes and black hair) to select from an Alabama law enforcement database of filler photos of the same general description as Mustafa; and culled from an "endless" number of search results to locate photographs of men with similar appearances. [Doc. 59 at 11]. It then argues that the details of the photographs themselves were not suggestive, since the photos each displayed men with substantial

similarities in facial features, color, race, facial hair, general body type and appearance. [*Id.* at 10-11].

The government also contends that the procedures were not unduly suggestive because DH was advised that the lineup may or may not contain the suspect; she should take her time; and the photos came from different sources, so the lighting and cameras used would be different. [*Id.* at 12]. The government further points out that DH was advised not to be swayed by discrepancies in the photos but to focus on the individuals. [*Id.* at 12-13]. The government then argues that DH picked out Mustafa almost immediately, and credited her ability to pick him out by the "look on this face." [*Id.* at 13 (citation omitted)].

As for Mustafa's arguments that his photo depicted a smaller head size and different-colored backgrounds and borders, the government argues that Eleventh Circuit case law leads to a conclusion that such minor distinguishing characteristics did not render the identification in this case unduly suggestive. [*Id.* at 13-14]. Also, the government contends that Rodriguez's statements to DH that he was investigating another incident and that the suspects had been identified did not invalidate the identification. [*Id.* at 14-15].

27

Next, the government argues that even if the identification procedures were unnecessarily suggestive, DH's identification of Mustafa should not be excluded because it was reliable. In this regard, it argues, DH had an excellent opportunity to view G and a high degree of attention. It points out that in DH's interview, she pointed out explicit details of her two-day ordeal, including the type and color of the vehicle and its defects, as well as a description of the residence and the cigarettes G and Lady smoked. [*Id.* at 16-18]. It further notes that once at the house, she was photographed by G for at least fifteen minutes and at that time, she was not blindfolded. [*Id.* at 17]. It also disputes Mustafa's contention that DH was blindfolded almost the whole of her ordeal, stating that she was not blindfolded until nearly twelve hours after she first was picked up, and then she was blindfolded only intermittently. [*Id.* at 18-19].

The government next argues that DH's pre-identification descriptions of DH were accurate, consistent with his driver's license information, and not generic, since she identified him as having a pockmarked face. [*Id.* at 19]. It also argues that she was absolutely certain of her identification and made her choice within seconds of being shown the array and only two weeks after the events. [*Id.* at 19-20].

Finally, the government argues that Mustafa has not shown that any comments by Rodriguez or Rankin actually influenced DH's identification. [*Id.* at 20]. It also

argues that the record shows that the officers adequately advised DH that the suspects may or may not be in the lineups ("Lady" was not) and that DH stated that what motivated her identification was the "look on his face." [*Id.*]. It also argues that the New Jersey Report did not mandate a double-blind sample, [*id.* at 20 n.1 (citing Doc. 42-6 at 41-42)], and in any event, the New Jersey Report is not binding on this court. [*Id.*].

### C.    Discussion

The Court concludes that DH's identification of Mustafa does not offend due process. When evaluating the suggestiveness of a photo array, courts examine several factors including: (1) the size of the array; (2) the manner of its presentation by law enforcement officers; and (3) the details of the photographs. *See United States v. Thai*, 29 F.3d 785, 808 (2d Cir. 1994); *United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994); *United States v. Cary*, No. 1:07-cr-74, 2008 WL 80650, at *20 (N.D. Ga. Jan. 4, 2008) (Duffey, J., adopting Vineyard, M.J.); *see also United States v. Clarke*, 611 F. Supp. 2d 12, 20 (D.D.C. 2009) (citing cases).

The photo array was not unduly suggestive. First, the undersigned notes that arrays of six photographs are not by themselves suggestive. *See United States v. Marrero*, 705 F.2d 652, 655 n.5 (2d Cir. 1983) (ruling that even a group as small as six

AO 72A
(Rev.8/8
2)

photos was not impermissibly small); *United States v. Bennett*, 409 F.2d 888, 898 (2d Cir. 1969) (finding six photographs an acceptable number for photographic identification array); *Cary*, 2008 WL 80650 at *20 (same); *Chandler v. Henderson*, No. CV-86-4213, 1987 WL 17087, at *6 (E.D.N.Y. Aug. 27, 1987) (same); *United States v. Doran*, 624 F. Supp. 94, 97 (E.D.N.Y. 1985) (same).[10] *Cf. United States v. James*, 415 F. Supp. 2d 132, 166 (E.D.N.Y. 2006) ("[C]ourts have generally held that a photo array containing six or more photographs is sufficiently large so as not to be unduly suggestive."). As a result, the six-photograph array displayed to DH is not inherently problematic.

Second, the Court rejects Mustafa's claim that the manner in which the photos were displayed to DH was unnecessarily suggestive. First, the Court disagrees that the officers' comments that there were other cases under investigation and that they knew the suspects amounted to unnecessary suggestiveness. The Court is aware that an identification procedure can be rendered improperly suggestive where police tell a witness that they have arrested one or more suspects, since imparting this information to the witness can lead him to assume that a photo of the arrested person will be in the

---

[10] The Court notes that in his post-evidentiary hearing brief, Mustafa does not contend that the six-photo array was too small a sample.

AO 72A
(Rev.8/8
2)

array, and the witness can feel pressure to make an identification, even if he is not fully confident, for fear of jeopardizing the case against the arrested suspect. *United States v. Saunders*, 501 F.3d 384, 391 (4th Cir. 2007); *see also Simmons*, 390 U.S. at 383 (stating that the "chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime"); *Grubbs v. Hannigan*, 982 F.2d 1483, 1490 (10th Cir. 1993) (stating that the suggestiveness inherent in the distinctive characteristics of the suspect's photo was compounded by the fact that the police had informed the witness that they had a suspect in custody). However, the facts of this case distinguish DH's identification from the scenarios in these other cases. Here, DH was not advised that suspects were in custody, but rather that the officers had identified them. *See* DVD at 11:25:48-55 (Sergeant Rodriguez stated that it "sounds like we know who this is, we have these people identified."); *see also id.* 10:26:21 ("[T]hrough some investigative work we've identified these folks."); *id.* 11:40:56 ("[W]e feel pretty sure we've i.d.'ed these guys."). At the same time, however, DH was told that "these lineups may or may not contain the individuals we suspect for this." *Id.* 11:36:31. She was told that they needed her to look at the arrays but to take her time, *id.* 11:36:40, because they could not accept an identification in the manner of "it's between this one and this one," *id.*

31

11:35:50. She was told again to take her time and "identify the person you think is the suspect." *Id.* 11:37:01. She also was told that the photos were "from different systems, from several different cities, different states" and that she should not be swayed by that. *Id.* 11:41:10. She was advised to "look at the photo and the person, see if the person fits the description you are talking about." *Id.* 11:41:15. She also was told that "the lighting is different, the camera is different, different states do things different ways, *id.* 11:41:23, so she should "focus on the photo," *id.* 11:41:27. While Rodriguez told her that "if you know them, they'll jump off the page," *id.* 11:41:29, Rankin added that men shave and they grow facial hair. At this point, DH interjected, before seeing the arrays, "I know what they look like." *Id.* 11:41:48. Thus even if any of the officers' comments rendered the procedure unnecessarily suggestive, they were coupled with adequate warnings to her such that under the totality of circumstances, including DH's pre-identification statement that she knew what they looked like, any taint of suggestiveness was removed.

Third, the Court also rejects Mustafa's arguments that the distinguishing characteristics of his photo from the others–his head size, background, and photo border–made the identification procedure unnecessarily suggestive. The similarities in the photo array, Gov't Ex. 1, far outweigh any differences. The array contained

32

photos of six non-bespectacled black males, in their late twenties to early thirties, with moderately dark complexions, closely cropped hair, and moustaches. Whether by shadows or skin type, each person displayed appeared to have some darkening marks in the beard area, consistent with DH's description of her assailant as having pits or lesions on his face. Each person in the photos is looking straight ahead. Mustafa in position number 5 displays a similar amount of his chest and shoulders area as position number 6, while position numbers 2 and 4 are more head shots, and position numbers 1 and 3 display slightly more of their shoulders. Only position number 1 is smiling. Like Mustafa in position number 5, position numbers one through four are wearing white t-shirts, while position number three is wearing a blue t-shirt with what appears to be a white sweater or jacket, and position number 6 is dressed in a coat, collared shirt, and tie. Also, although Mustafa's background is the lightest in color, it is the same color (light blue) as the other backgrounds, and not much lighter than the background for position number 6. And, while it is true that the photo of Mustafa's head is smaller than the others in the array and only his photo appears to have a partial border, that there are some differences in physical appearance does not render the array impermissibly suggestive. *United States v. Knight*, 382 Fed. Appx. 905, 907 (11th Cir. June 15, 2010) (finding that "[a]lthough Knight was of a lighter complexion than four

33

AO 72A
(Rev.8/8
2)

of the other individuals in the array and the background lighting in his photograph was slightly different from some of the other photographs, neither of these differences were [sic] stark enough so as to be unduly suggestive," and distinguishing *Marsden v. Moore*, 847 F.2d 1536, 1545 (11th Cir. 1988) (procedure unduly suggestive where defendant was the only male in the photographs shown to the eyewitness), and *O'Brien v. Wainwright*, 738 F.2d 1139, 1140-41 (11th Cir. 1984) (procedure unduly suggestive where witness was shown all black-and-white mug shots except for one color photograph, which was a photograph of the defendant)); *Cikora*, 840 F.2d at 897 (no impermissible suggestiveness in lineup procedure where defendant's facial hair more sparse than most of the other participants); *United States v. Ricks*, 817 F.2d 692, 697 (11th Cir. 1987) (line up depicting defendant as only individual wearing glasses held appropriate); *Blanco v. Dugger*, 691 F. Supp. 308, 312 (S.D. Fla.1988), *aff'd sub nom. Blanco v. Singletary*, 943 F.2d 1477 (11th Cir. 1991) (defendant's facial hair and dress differences not " 'unnecessarily suggestive and conducive to irreparable mistaken identification.' " (quoting *Foster*, 394 U.S. at 442)); *United States v. Ullrich*, 580 F.2d 765, 773 (5th Cir. 1978) ("[T]he disparate physical appearances of the lineup participants is not alone sufficient to warrant a finding of suggestiveness." (citations omitted)); *see also United States v. McComb*, 249 Fed. Appx. 429, 440 (6th Cir. Oct. 3,

34

2007) ("A darker hue or different colored background does not 'in [itself] create an impermissible suggestion that the defendant is the offender.' " (alteration in original) (citations omitted)); *United States v. Traeger*, 289 F.3d 461, 474 (7th Cir. 2002) (noting that law enforcement is not required "to search for identical twins in age, height, weight, or facial features"); *United States v. Mathis*, 264 F.3d 321, 333 (3d Cir. 2001) (holding that "slightly darker" background of defendant's picture "did not significantly contribute to the array's unnecessary suggestiveness"); *United States v. Burdeau*, 168 F.3d 352, 357 (9th Cir. 1999) (holding that a photographic array was not impermissibly suggestive even though the defendant's picture "was placed in the center of the array, was darker than the rest, and was the only one in which the eyes were closed"); *United States v. Espinoza*, 26 F.3d 133 (9th Cir. 1994) (unpublished table decision) ("In light of the totality of the surrounding circumstances, the fact that Espinoza's image was smaller does not in and of itself render the procedure impermissibly suggestive."); *United States v. Bautista*, 23 F.3d 726, 731 (2d Cir. 1994) ("While it is true that the photograph of [the defendant] is slightly brighter and slightly more close-up than the others, we find that these differences did not render the array suggestive."); *Mitchell v. Goldsmith*, 878 F.2d 319, 323 (9th Cir. 1989) (holding that "[t]he various background colors among . . . photographs and the 1981 date on

35

[defendant's] photo [did] not make the line-up unduly suggestive"); *United States v. Marchand*, 564 F.2d 983, 995 (2d Cir. 1977) (differences in sizes of pictures and fact that defendant's photograph "was somewhat marred by glare" did not render photo array impermissibly suggestive). *But see United States v. Wiseman*, 172 F.3d 1196, 1209 (10th Cir. 1999) ("[D]ifferences such as background color can make a picture stand out, and can act to repeatedly draw a witness's eye to that picture.") (citation omitted). It also is critical in this case that DH was repeatedly warned that the photos were drawn from different jurisdictions and that their lighting and photography methods were dissimilar and that she should focus on the photos themselves. She also stated before she was shown any photos that she knew what her assailants looked like. Most significantly, when DH was asked why she identified Mustafa as her assailant, she stated it was because of "the look on his face" and not because his photo was different from the others in the array.

As a result, the Court finds that the physical displays were not unnecessarily suggestive.

To the extent that the District Court disagrees with this conclusion, the Court will discuss whether, under the totality of the circumstances, the identification was nonetheless reliable.

36

First, DH had more than a sufficient opportunity to view Mustafa in order to make a reliable identification, despite Mustafa's contentions that she was either blindfolded or too scared to observe her assailants. Although she was in the back seat of the vehicle after G and Lady picked her up from her home, they drove for forty minutes until they arrived at the house, including stopping for drinks. She had an adequate opportunity to observe G during this leg of the trip. Once at the house, G photographed her for at least fifteen minutes, again providing adequate time to observe him. After she was raped (during which she did at times look at him, thus enduring additional punishment), G made her drink vodka and snort cocaine, again without blindfolds. Next, she was not blindfolded when Lady went out in Atlanta to perform acts of prostitution, during which time G photographed DH again with his cell phone. Finally, once they were in Alabama, she spent a number of hours in G's company not blindfolded while presumably waiting for prostitution customers, who never arrived. Thus, DH had more than sufficient opportunity to observe G.

Second, the Court also rejects Mustafa's claim that due to the stressful ordeal, DH did not have an adequate degree of attention to make the identification reliable. To the contrary, because of the stressful situation DH perceived herself to be in, she paid very close attention from the beginning. Even before she was physically attacked and

37

raped, DH was suspicious of the circumstances of her encounter with G and Lady, and took notes on her cell phone about where they were going. She recalled minute details about the vehicle, house, hotels, and the cigarette brands of her tormenters, as well as their physical characteristics, such as G's and Lady's tattoos and his cracked teeth and pitted face.

Third, while Mustafa contends that DH's description of him was too generic to be viewed as accurate, among his other physical characteristics, she described his pitted or lesion-covered face. As a result, her description was definite enough to determine its accuracy. She also was able to specifically describe the types of hats he wore (and when he wore them) and the shoes he was wearing.

Fourth, DH's level of certainty that Mustafa was G was exceptionally high. She stated even before being shown the array that she knew what he looked like. Also, when presented with the array, she picked him out in seconds. She stated she was certain it was him because of "the look on his face." DVD at 11:42:38.

Fifth, the two weeks between the crimes and the identification is short enough to render the identification reliable. *United States v. Sierra*, 390 Fed. Appx. 793, 798 (10th Cir. Aug. 6, 2010) (holding that eleven days was a short period and citing *Archuleta v. Kerby*, 864 F.2d 709, 712 (10th Cir. 1989), which listed cases where time

38

intervals of several months were found not to be so long as to cast doubt on the reliability of identifications); *United States v. Fink*, 328 Fed. Appx. 183, 192 (4th Cir. May 14, 2009) (finding identification reliable where only two weeks transpired between the drug transaction and identification of defendant in photographic array). *Cf. United States v. Causey*, 834 F.2d 1277, 1286 (6th Cir. 1987) (noting that "three to four-month delay between the crime and the identification does not render the identification inherently unreliable").

Finally, the Court concludes that the New Jersey Report recommendations are no more helpful to Mustafa in challenging DH's identification than they were in contesting the other victims' identifications. First, in addition to those reasons, *supra* at 11-12, this Court is bound by Supreme Court and Eleventh Circuit decisions and not those of the New Jersey Supreme Court. *Key v. Wise*, 629 F.2d 1049, 1058 (5th Cir. 1980) ("[F]ederal courts are not bound by state court decisions on matters of federal law."). Second, the New Jersey Supreme Court only recommends a non-exhaustive list of "system variables" such as blind administration, pre-identification instructions, etc., to determine the presence of suggestiveness. *See State v. Henderson*, 208 N.J. 208, 289-90, 27 A.3d 872, 920-21 (2011). This Court, however, is bound by the tests enunciated by the Supreme Court and the Eleventh

39

AO 72A
(Rev.8/8
2)

Circuit. Third, while the array in this case was not prepared or shown using double-blind procedures, the fillers used comported with the description given by DH of her male attacker. Finally, DH stated that she was aware of what her attackers looked like even before she was shown any photo arrays, and after selecting Mustafa's photo as G, she stated that she was certain it was him not due to the officers' comments or idiosyncracies of the photo displays, but by the "look on his face." Her identification, based on the totality of the circumstances, was not tainted by state misconduct and therefore its reliability is for the jury, and not the Court, to decide. *Perry*, 132 S. Ct. at 723-25.

## III. Conclusion

For all of the above reasons, the undersigned **RECOMMENDS** that Mustafa's motion and amended motion to suppress identification, [Docs. 26, 42], should be **DENIED**.

The Court has now ruled on all matters referred to it in this case. Therefore, the case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND CERTIFIED**, this the <u>12th</u> day of April, 2012.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)